894 A.2d 1180 (2006)
384 N.J. Super. 351
STATE of New Jersey, Plaintiff-Respondent,
v.
Ahmed ELKWISNI, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 2005.
Decided April 6, 2006.
*1182 Jeffrey J. Garrigan argued the cause for appellant (Cammarata, Nulty & Garrigan, attorneys; Thomas J. Cammarata, Jersey City, on the brief).
John J. Scaliti, Assistant Prosecutor, argued the cause for respondent (John L. Molinelli, Bergen County Prosecutor, attorney; Mr. Scaliti, of counsel and on the brief).
*1183 Before Judges WECKER, FUENTES and GRAVES.
The opinion of the court was delivered by
FUENTES, J.A.D.
Defendant Ahmed Elkwisni was convicted after a jury trial of second-degree robbery, in violation of N.J.S.A. 2C:15-1; and third-degree possession of a weapon without a permit, in violation of N.J.S.A. 2C:39-5b. He was acquitted of kidnapping, armed robbery, aggravated assault, terroristic threats, and second-degree possession of a handgun for an unlawful purpose. The trial court sentenced defendant to an aggregate term of four years,[1] subject to an eighty-five percent parole ineligibility period under the No Early Release Act (NERA). N.J.S.A. 2C:43-7.2.[2] The court also imposed the mandatory fines and penalties.
Defendant now appeals raising the following arguments:
POINT ONE
THE TRIAL COURT IMPROPERLY PERMITTED THE STATE TO INTRODUCE A STATEMENT BY THE DEFENDANT ELKWISNI REGARDING THE LOCATION OF THE GUN USED IN THE ROBBERY SINCE THE STATEMENT WAS MADE WHILE HE WAS IN CUSTODY AND WITHOUT A VOLUNTARY, KNOWING AND INTELLIGENT WAIVER OF HIS FIFTH AMENDMENT RIGHTS TO REMAIN SILENT AND TO HAVE COUNSEL PRESENT AFTER ADEQUATE ADVICE.
POINT TWO
THE PROSECUTOR'S REPEATED CROSS-EXAMINATION AND COMMENTS IN SUMMATION ON DEFENDANT'S SILENCE AT THE TIME OF HIS ARREST INFRINGED ON THE DEFENDANT'S PRIVILEGE AGAINST SELF-INCRIMINATION UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND NEW JERSEY STATE LAW.
POINT THREE
THE TRIAL JUDGE ERRED BY DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE TO ORDER A NEW TRIAL AS THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
We agree with defendant's argument as to Point One. We are satisfied that the record developed before the trial court at a N.J.R.E. 104 hearing was insufficient, as a matter of law, to determine, beyond a reasonable doubt, that defendant voluntarily and knowingly waived his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See also State v. Adams, 127 N.J. 438, 447, 605 A.2d 1097 (1992). We are equally satisfied, however, that the appropriate remedy to correct this error is not reversal of defendant's conviction, but to remand this discrete issue to the trial court to conduct a new hearing on voluntariness.
We discern no legal basis to reverse defendant's conviction based on the arguments raised in Points II and III. The argument raised in Point III lacks sufficient merit to warrant discussion in a written *1184 opinion. R. 2:11-3(e)(2). In the interest of clarity, we will nevertheless examine the argument raised in Point II, in order to delineate the proper boundaries of cross-examination by the State when a defendant testifies regarding statements he made to the police after his arrest. Here, defendant offered these statements in support of his affirmative defense of duress.
As the facts here illustrate, the line of demarcation between legitimate impeachment of a defendant's credibility through the use of prior inconsistent statements, and improper inquiry or comment on defendant's constitutional right to remain silent, is not always clear. This question was only obliquely noted by the Supreme Court in State v. Muhammad, 182 N.J. 551, 566 n. 3, 868 A.2d 302 (2005), and was not directly raised in State v. Black, 380 N.J.Super. 581, 883 A.2d 1065 (App.Div. 2005), our most recent post-Muhammad opinion.
This case gives us the opportunity to address the issue directly, and, in the process, provide guidance to the trial courts on how to: (1) safeguard a defendant's constitutional right to remain silent, by setting strict limits on the scope of the State's cross-examination; and (2) craft jury instructions that will enable jurors to distinguish between legitimate evidence that may affect a defendant's credibility, and an unconstitutional inference of culpability based on a defendant's post-arrest silence.
We will consider all of defendant's arguments on appeal in the context of the following facts, which we summarize here based on the evidence presented at trial.

I

The Facts
On March 24, 2003, at approximately 8:30 p.m., Ibrahim Samha and defendant entered a convenience store in Fairfield owned and operated by Jamal Darwish. The two men approached Darwish while he was sitting behind the cash register and Samha pointed a handgun at Darwish's head and demanded money. Samha was wearing blue transparent gloves. Samha then pulled the storekeeper from behind the counter, and struck him in the face and head several times with the handgun. According to Darwish, while he was on the floor, defendant kicked him repeatedly in the stomach. Both men then dragged the victim to an aisle, in an apparent attempt to shield him from the view of any passerby. Samha kneeled on Darwish's neck, maintaining the gun pointed at his head.
According to Darwish, defendant obtained the keys to the store and, after some initial difficulty, was able to lock the entrance doors. Darwish was then tied up with duct tape, while Samha continued to kneel on him, demanding money and making repeated threats to kill him. Darwish finally capitulated to the assailants' demands, and gave defendant directions on how to open the register. Dissatisfied with the amount of money in the register, defendant allegedly told Samha to "finish [Darwish] off."
While the robbery was in progress, a customer, subsequently identified as Alan Pollock, tried to enter the store, only to discover the door was locked. Pollock testified that he saw defendant walk to the cash register and attempt to open it. Pollock also observed defendant wave his arms at him, as if to indicate that the store was closed. Although Pollock initially left, he quickly returned and observed Samha standing behind the counter ripping phone cards off the wall. The police arrived shortly thereafter.
Upon their arrival, the police observed Darwish inside the store, lying on the floor, with his hands tied with duct tape. He was also bleeding from the head. Darwish *1185 testified that as the police attempted to break down the locked door, defendant told Samha to cut the duct tape from Darwish's hands. It was also around this time that defendant took possession of the gun, and hid it. According to defendant, he did this to avoid the potential for a violent confrontation with the police.
Prior to the police forcibly entering the store, Darwish testified that one of the defendants gave him the store key. All three men then walked, single file, toward the front of the store, with Darwish in the front, Samha behind him, and defendant in the rear. Darwish opened the door, and the police immediately rushed in and ordered the two defendants to the ground.

II

The Miranda Issue
During the trial, at the completion of the victim's testimony, the trial court excused the jury, and conducted a N.J.R.E. 104 hearing to determine the admissibility of an oral statement allegedly made by defendant after he was in police custody.[3] Richard Uram was the first Garfield police officer to interact with defendant. Uram handcuffed defendant while he was on the ground, and placed him in the back of a police car. According to Uram, he read defendant his Miranda rights. At the time of defendant's arrest, Uram's main concern was the recovery of the handgun used in the robbery. Uram gave the following account of what transpired after he placed the handcuffed-defendant in his police car:
I began talking to [Elkwisni]. Well, first, after I arrested him, I  I read him his rights. I remind him again of his rights inside the car and I asked him  I said, you know, believe there's a gun involved, this is a store, kids go in the *1186 store, if you hid it in the store, tell us where it is. I mean, God forbid a kid goes in there and grabs this gun and he ends up thinking it's a toy, he shoots somebody and he kills him. You know, we have to put the public safety 
* * * *
Q. And you said that you reminded him of his rights in the car. Where was the first place that you advised him of his rights?

A. Once he was cuffed.
Q. All right. And was that a verbal or written form?
A. Verbal.
Q. And then you said you reminded him of his rights again in the car. What car are you referring to?
A. My police unit at the time.
* * * *
Q. Okay. So the only two people in the car when you were reminding him of his rights in the car was you and the defendant Ahmed Elkwisni?
A. He was in the car, I was standing alongside the car speaking with him with the door open.
Q. Okay. You're standing alongside. Okay.
A. Yes. He was in the back.
Q. Now when you're having this conversation with him, I take it you're speaking in English?
A. Yes.
Q. And what about him? What is he speaking to you and after you advised him of his Miranda rights did he say anything to you.
A. He was  he was speaking. When he spoke to me, he speak [sic] English. At first he declined that there  he didn't know anything about a gun. As he's telling me this, he's looking around. He just appeared very nervous. He just kept looking right to left, right to left, looking  looking around and he just  he kept denying it, denying it, denying it. Then eventually he told me  he goes, "It's behind the Huggies."
Q. And nobody else was around other than  the other defendant was not there at the time, correct?
A. The other defendant had  had no contact whatsoever where I was.
* * * *
Q. Now at a later point in time at headquarters, was there a written form given to the defendant with regards to his Miranda rights, Ahmed Elkwisni? Were you involved in that at all?
A. Not by me.
Q. That was another police officer?
A. I  if  if someone else gave it to him, I don't know. Maybe a detective did.
[Emphasis added.]
Uram gave the following additional facts during defense counsel's cross-examination:
Q. Okay. And what is this document?
A. Advising somebody of their Miranda rights.
Q. Okay. And what time is that document executed?
A. It says 11:30 p.m.
Q. Okay. You had arrested him much earlier in the evening, hadn't you?
A. Yes.
* * * *
Q. In the incident report that you filled out 
A. Yes.
Q.  you never indicated that you read him his Miranda rights, did you?

*1187 A. I don't believe I put it in the report.
Q. Customarily it would be included in there, wouldn't it?
A. I usually don't put it in there, only on DWI cases.
Q. Well, aren't you required to by statute?
A. To put it in the report?
Q. Correct.
A. Not to my knowledge.
* * * *
Q. You also [in your report] used the words "with the safety of the public in mind"?
A. Correct.
Q. Do you normally qualify the reason that you're asking a suspect a question?
A. Can you repeat that?
Q. Do you normally qualify, indicate the reasoning for asking a suspect a particular question in your reports? You say the reason that you're asking the question.
A. I just put it down. I mean, I don't understand what you're trying to say.
* * * *
Q. Okay. So when you normally fill these out, okay, in other cases other than this one, do you normally, customarily, in your regular course of filling these out state in your reports the reason that you're asking a suspect a particular question?
* * * *
A. I just  if  if, I mean, sometimes you have to do things in order, like probable-cause order, you know?
Q. So you were trying to establish some reason or justification for asking him the question?
A. What was the  what was the line again?
Q. Well, the line was, "This officer, with the safety of the public in mind, asked."
A. Right. Well, because that was my  I wanted to make sure whoever read it understood that's why I was asking him that question.
* * * *
Q. Your testimony now is that you can remember an arrest a lot of arrests ago, maybe seventy-five arrests ago, we'll say, today even though there's no record of it of what you did that day?
A. When I place somebody in custody, I read them their rights.
Q. Is that something that you normally do?
A. That's how we're trained.
Q. So you're testifying from what you normally do. You don't necessarily know that you did it that day?
A. I know I did it that day because I do it every time I make an arrest.
Q. So you only know you did it that day because you customarily do it?
A. Because I always do it.
Uram was the only witness to testify at the N.J.R.E. 104 hearing. In fact, his testimony was the only evidence presented by the State in support of admitting the statements made by defendant shortly after he was arrested.
At the close of the testimony, defense counsel made the following argument in support of his application to exclude defendant's statement:
I think he clearly testified that he doesn't have any independent record of having read his Miranda rights to this witness that day. His testimony was that he normally does it, but that he *1188 doesn't have any independent recollection as to this particular arrest.
Clearly, there's nothing in his statement to support a claim that he did read him his Miranda rights. The Miranda form itself is not executed until 11:30 p.m. that evening. He indicates in his statement a reason or some justification for having questioned him, which seems a little unusual. I think, Your Honor, the statement should be excluded.
Relying exclusively on Uram's testimony, the trial court made the following findings:
[In determining the adequacy of] Miranda warnings, basically the Court is instructed to go to the totality of the circumstances. This particular case the testimony is that [Uram] responded to an armed robbery arrest .... and at the time he arrested [defendant], that he had read him his rights and reminded him of those in the car; that he had cuffed him; that initially Mr. Elkwisni said he knew nothing about the gun, but then the officer had said something to him about safety of children. And as a result of that, he said they were behind the Huggies.
Based upon the totality of the circumstances, it appears the Miranda warnings were read to him; that the defendant understood them based upon the officer's question. There didn't seem to be any trickery. I guess we're touching upon the Christian burial a little bit as to the safety of children, but it was voluntarily made. I will allow it.

A

Waiver of Miranda Rights
We start our analysis of this issue by reaffirming certain basic principles of constitutional law.[4] In determining the adequacy of Miranda warnings given by the police as a prerequisite to finding that defendant knowingly, voluntarily and intelligently waived the rights contained therein, a court's function is not simply to ascertain whether the police meticulously performed some mechanical exercise. A court must carefully review the substance of what was communicated by the police to a defendant, in order to determine whether the alleged waiver was the product of an informed, intelligent and voluntary decision. As Justice Clifford wrote more than thirty years ago:
In resolving the adequacy of the language of a Miranda warning a court should give precedence to substance over form. The decision does not require that any specific language be used to inform an accused of his rights.... The "words of Miranda do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are sufficient."
[State v. Melvin, 65 N.J. 1, 13-14, 319 A.2d 450 (1974) (citations omitted) (emphasis added).]
See also State v. Dixon, 125 N.J. 223, 242, 593 A.2d 266 (1991); State v. Messino, 378 N.J.Super. 559, 577, 876 A.2d 818 (App. Div.), certif. denied, 185 N.J. 297, 884 A.2d 1266 (2005).
The dissent concludes that the trial court was "entitled to credit the officer's unrefuted testimony that he followed his usual procedure of giving the required warnings to every arrestee." Adoption of the dissent's analysis would render a Miranda *1189 hearing perfunctory, devoid of both substance and meaning.
Miranda warnings are given with the purpose "to neutralize the pressure inherent in custodial interrogation." State v. Smith, 374 N.J.Super. 425, 433, 864 A.2d 1177 (App.Div.2005). Prior to questioning defendant, Officer Uram was required to warn him (1) of the right to remain silent; (2) that any statement he made could be used against him; (3) he had a right to an attorney; (4) if he could not afford an attorney, one would be provided; and (5) he had the right to stop answering questions at any time. Duckworth v. Eagan, 492 U.S. 195, 198, 109 S.Ct. 2875, 2877, 106 L.Ed.2d 166, 174 (1989); Miranda v. Arizona, supra, 384 U.S. at 444-45, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-07; State v. Knight, 183 N.J. 449, 462, 874 A.2d 546 (2005); State v. Godfrey, 131 N.J.Super. 168, 173, 329 A.2d 75 (App.Div. 1974), aff'd, 67 N.J. 267, 337 A.2d 371 (1975).
We review a trial court's findings as to the admissibility of a defendant's confession under the "sufficient credible evidence" standard. Knight, supra, 183 N.J. at 468, 874 A.2d 546. We will only reverse these findings if they are not supported by substantial credible evidence. State v. Johnson, 116 N.J. 99, 102, 561 A.2d 243 (1989). Under this standard of review, it is "improper for the Appellate Division to engage in an independent assessment of the evidence as if it were the court of first instance." State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999). We are "not permitted to `weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence.'" Id. at 472, 724 A.2d 234 (quoting State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997)). Our review is restricted to assessing "`whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present in the record.'" Ibid.
Mindful of this standard, we nevertheless conclude, as a matter of law, that the evidence presented to the trial court was insufficient from which to conclude that defendant made a knowing, informed, and voluntary waiver of his rights under Miranda. Here, we are unable to discern from the phrases "I read him his rights," or "I advised him of his rights," what information Uram conveyed to the handcuffed defendant when Uram began to question him in the back of the police car. Without more, there is no factual or legal basis to sustain the trial court's conclusion that "[b]ased upon the totality of the circumstances, it appears the Miranda warnings were read to [defendant]" and that "defendant understood them based upon the officer's question."
It is self-evident that there can be no knowing, intelligent, and voluntary waiver of the rights under Miranda, when the record does not reflect that a fair and accurate recitation of those rights was in fact given by the police to the defendant. Cf. State v. DiFrisco, 174 N.J. 195, 235-36, 804 A.2d 507 (2002), cert. denied, 537 U.S. 1220, 123 S.Ct. 1323, 154 L.Ed.2d 1076 (2003). Without competent evidence from which to find, beyond a reasonable doubt, that defendant waived his rights under Miranda, State v. Adams, 127 N.J. 438, 447, 605 A.2d 1097 (1992), the trial court's legal conclusion cannot be sustained.
Based on the record developed at the N.J.R.E. 104(c) hearing, the police did not use any improper interrogation techniques to extract an inculpatory statement from defendant. In fact, defendant's attack on the admissibility of the statement is based entirely on a "sufficiency of the evidence" standard, not on the methods used by the police to question defendant. *1190 Stated differently, the record here lacks an adequate evidential foundation from which to conclude that defendant, who was in custody, was given the required information under Miranda; that he understood the information; and that he voluntarily decided to speak to the police about the location of the gun, without first consulting with an attorney. We consider this situation to be the functional equivalent of the total absence of a hearing, requiring a remand to the trial court to conduct a new hearing on voluntariness. State v. Kelly, 61 N.J. 283, 294-95, 294 A.2d 41 (1972); State v. Marczak, 344 N.J.Super. 388, 398, 782 A.2d 440 (App.Div.2001), certif. denied, 171 N.J. 44, 791 A.2d 222 (2002). On remand, if the State fails:
[T]o establish voluntariness beyond reasonable doubt, the defendant will be entitled to a new trial at which the statements will be excluded. If, however, the State does establish beyond reasonable doubt that the statements were voluntary, and the trial judge so determines, then the defendant's conviction may stand.
[State v. Kelly, supra, 61 N.J. at 294, 294 A.2d 41 (citations omitted).]
We are thus satisfied that the remedy here is to remand the matter for a new hearing to determine voluntariness.

B

Public Safety Exception
The State argues in the alternative that even if the record does not support the conclusion that defendant waived his Miranda rights, his statements about the whereabouts of the handgun were nevertheless admissible pursuant to the exigency or public safety exception to Miranda. We disagree.
The public safety exception to the requirement that a person subjected to custodial interrogation by police be given Miranda warnings was first articulated in New York v. Quarles, 467 U.S. 649, 655-56, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 557 (1984). In Quarles, the police were investigating a sexual assault committed with a handgun. The investigating officer spotted the suspect approaching a supermarket checkout counter. The suspect was apprehended inside the store carrying an empty gun holster. Immediately after handcuffing the suspect, and prior to reading him his Miranda rights, one of the officers asked him about the whereabouts of the gun. The suspect "nodded in the direction of some empty cartons and responded, `the gun is over there.'" Quarles, supra, 467 U.S. at 652, 104 S.Ct. at 2629, 81 L.Ed.2d at 554.
In creating an exigency exception, the majority of the Court in Quarles emphasized that "in the very act of apprehending a suspect, [the police] were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." Quarles, supra, 467 U.S. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 557-58.
The Court thus reasoned that "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda." Quarles, supra, 467 U.S. at 653, 104 S.Ct. at 2630, 81 L.Ed.2d at 555.
In State v. Stephenson, 350 N.J.Super. 517, 796 A.2d 274 (App.Div.2002), we declined to invoke the exigency exception, and emphasized the need to narrowly construe its application. Id. at 524-25, 796 A.2d 274. The facts in Stephenson illustrate this point. The police received information that the defendant had threatened to shoot a person with whom he had allegedly argued earlier. The police proceeded *1191 to the defendant's motel, handcuffed him, and demanded to know the location of the gun. Contrasting the facts in Stephenson to the Quarles case, we noted that the circumstances of the threat were not immediate, and the gun was not believed to be concealed in a public area, with unrestricted access to it by third parties.
The Stephenson court established that the Quarles exigency exception applies only where the circumstances indicate "(1) there [is] an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety." State v. Stephenson, supra, 350 N.J.Super. at 525, 796 A.2d 274.
Here, defendant and his cohort were apprehended by the police, without any opportunity to conceal the weapon used in the robbery, in any other location but inside the store. The store was surrounded by law enforcement personnel, and the entire area was secured as a crime scene after defendant's arrest. The record is silent as to what efforts, if any, the police undertook to locate the weapon without defendant's assistance. One thing is clear, however; there was no immediate threat to public safety triggering the application of the Quarles exception.
Uram's questions about the gun began after defendant had been handcuffed and placed in the police car. There is no evidence to support the State's claim that the police's interrogation was the product of a spontaneous concern for the safety of the public. According to Uram, he read defendant his Miranda rights on at least two separate occasions. Once immediately after arresting defendant and escorting him to the police car, and again after Uram learned that the gun used in the robbery had not been located. In this context, the "public safety" issue arose as an interrogation tactic, not as an impromptu attempt to address an obvious and immediate public danger. Applying the Quarles exception to these facts subverts the constitutional protections embodied in Miranda, and opens the door to the pre-textual invocation of "public safety" whenever the police are not immediately able to recover weapons used in the commission of a crime.

III.

Post-Arrest Conduct
We will now address a question left partially unanswered by the Supreme Court in Muhammad. Namely, what are the limits of prosecutorial inquiry as to defendant's post-arrest silence, when defendant testifies at trial as to the substance of exculpatory statements he allegedly made at or near the time of his arrest. This issue pits defendant's constitutional right to remain silent against the State's right to challenge the credibility of defendant's affirmative defense of duress. Stated differently, are the concerns raised by the Supreme Court in Muhammad minimized or rendered irrelevant once a defendant affirmatively testifies about what he told the police at or near the time of his arrest?
As with most things in life, the answer to this question cannot be stated through a simple "yes" or "no." Once a defendant testifies about statements he made to the police at or near the time of his arrest, the State must be permitted to cross-examine him regarding whether or not these alleged statements were actually made. Cross-examination of the defendant however, must be carefully circumscribed. The prosecutor may not wander into areas not covered by a defendant's direct testimony, to suggest, even implicitly, that a defendant had an affirmative duty to come forward with exculpatory evidence. The *1192 State is not permitted to use omitted details or other indicia of the right to remain silent, to shift the burden of proof to the defendant. See State v. Galiyano, 178 N.J.Super. 393, 397, 429 A.2d 385 (App. Div.), certif. denied, 87 N.J. 424, 434 A.2d 1096 (1981).
The trial court must also craft jury instructions that will enable jurors to distinguish between legitimate evidence that may affect a defendant's credibility, (internal inconsistencies in the testimony and rebuttal evidence), and drawing a constitutionally impermissible inference of culpability from a defendant's post-arrest silence.
Here, defendant asserted the affirmative defense of duress. He testified that he was never part of any plans to carry out the robbery, and only entered the store to purchase a soft drink and get something to eat. During his direct examination, he gave the following description of the events that transpired once inside the store:
Q. What did you observe when you walked in the store?
A. When I walked into the store, I saw [the co-defendant]. He was standing at the  at the register, and he was talking to the cashier.
Q. Okay. And what did you do?
A. I walked down the aisle to the refrigerators to get like an orange drink or something.
Q. Okay. And what happened next?
A. Well, when I was at the refrigerator, I could hear like yelling in the front. It was like loud yelling, and there was like stuff falling. I could hear like stuff falling. So I turned around to see what was going on but the shelves were pretty high, so I had to walk back to the front of the store to see what was going on.
Q. And what did you observe when you got to the front of the store?
A. When I got to the front of the store, [the co-defendant], he was fighting with the store guy. There were like  they were grabbing each other and they were both fighting over a gun, so I was shocked. I was just standing there, and the [co]-defendant had blue gloves on and, in a matter of seconds, the 
THE COURT: You mean [the co-defendant] had blue gloves on.
PROSECUTOR: Objection, Your Honor.
A. Sorry about that. The  [co-defendant], he had blue gloves and, in a matter of seconds, the store guy was on the floor, and now the gun was being pointed at me.
Q. The gun was being pointed at you?
A. Yeah.
Q. And what did you do?
A. I couldn't do anything; he was standing right in front of me.
Q. So what happened next?
A. He started yelling at me to like come here. He kept yelling come here. And I was shocked. This guy had blue gloves on; he had the gun; I didn't know what was going on; and the other guy, he was just laying on the floor. So [the co-defendant], he comes up to me, he grabs me by my shirt, and starts pulling me to the back of the store.
Q. What happened after that?
A. When I got to the back of the store, like he was standing behind me, he kept like pushing me to the back of the store, but the store guy, he was like laying on the floor, and like I couldn't walk over him, so he kept like pushing me up against the aisles and stuff were falling off the aisles.
Q. And Mr. Darwish was on the ground?

*1193 A. Yeah.
Q. Okay. What happened once he got you to the back of the store?
A. When I was in the back of the store, he told me not to move. He told me just stay there, and he started yelling at the store owner.
Q. What was he yelling to him?
A. He was yelling to him I want my money, and then he kept yelling to him give him the keys to the store.
Q. Okay. And did Mr. Darwish give him the keys?
A. Yeah. He took it out of his pocket.
Q. And what happened then?
A. Then [the co-defendant] like  he came up to me again, he started grabbing me, and he walked me towards the front door and told me to lock the door. I dropped the keys. I didn't want to  I was scared, I didn't want to lock the door. I didn't lock myself in there, too, so 
Q. Why were you afraid?
A. Because he had a gun to the  like he was grabbing the back of me, and he had the [gun] in his other hand.
Q. Okay.
A. So 
Q. What did you do with the keys?
A. I dropped the keys, then like he pushed me down to pick them up, and I picked up the keys and I gave them back to him. And then he handed me back the keys and he said go lock the door. I got to the front, I put the key in the door, I didn't lock it, but he was still standing behind me just like persistent for me to lock the door. He kept yelling at me, so I locked the door and I took the keys and I put it on the counter.
Q. Okay. And what happened after that?
A. Then he grabbed me to the back of the store, and he told me just stand there. And he walked to the front; he started grabbing stuff off the shelves.
Q. Okay. And where was Mr. Darwish during that time?
A. He was on the floor.
Q. Okay. And was he tied up or anything?
A. No. He was just told not to move.
Q. And what were you doing?
A. I was just standing in the back.
Q. Okay. And [the co-defendant], what was he doing at that point?
A. I don't know. He went to the front of the store. I couldn't see him because of the shelves again. He just kept yelling, he was yelling at the store owner.
Immediately after he was arrested, defendant testified that his first concern was to avoid being placed in the same police car as the co-defendant. Once he was certain that he would not be exposed to any further intimidation or possible retaliation by co-defendant, defendant testified that he attempted to inform Officer Uram about the coercion and intimidation he experienced in the store. The following excerpt from his direct testimony illustrates the point:
After I saw the officer take [co-defendant] to the other car ... because I told [the police officer]  I said, don't bring him over here. And he said, all right. He's going to send him over to another car. When they sent [co-defendant] to the other car, I told [the officer] what happened inside the store.

[Emphasis added.]
It is clear to us that defendant used this testimony as a critical part of his duress defense. These post-arrest statements, allegedly made at the scene, without the opportunity to reflect or consult with counsel, are intended to bolster defendant's *1194 credibility, by rebutting any implication of recent fabrication. Under these circumstances, the State must be given a fair and reasonable opportunity to cross-examine defendant as to what details he allegedly gave to the police.
The State is also entitled to present rebuttal testimony from the officer allegedly involved in these conversations. Such rebuttal evidence may, if necessary to contradict defendant's testimony, include not only what the officer remembers defendant saying, but also what he remembers him not saying. This conclusion does not contravene Muhammad. This kind of rebuttal testimony, (what the witness remembers defendant not saying), is proper, so long as it is restricted to refuting defendant's trial testimony. That is, if defendant testifies that he told the police officer: "the car was red," the officer, in rebuttal, may testify that defendant made no such statement.
On the other hand, if defendant does not testify that he made a statement about the color of the car, the State cannot use that omission as a means of attacking defendant's credibility, by having the rebuttal witness testify that no such statement was made to him or her. Rebuttal testimony impinges upon a defendant's constitutional right to remain silent when it suggests that the mere absence of a statement at the time of arrest is a basis to doubt the veracity of defendant's trial testimony.
The circumstances in this case are critically different than the facts the Supreme Court confronted in State v. Muhammad. In Muhammad, defendant, who had identified himself as a Paterson police officer, used this authority to lure the victim into his car. He then drove the victim to a secluded area where he sexually assaulted her. State v. Muhammad, supra, 182 N.J. at 559, 868 A.2d 302. After the assault, defendant took the victim to the Paterson police headquarters. Once there, defendant identified himself as a police officer to the desk sergeant, and claimed that he had "brought [the victim] in" because she had been harassing his brother and sister. The victim immediately denied these allegations, accused defendant of sexually assaulting her, and produced the condom defendant had allegedly used during the assault as proof of her claims. Id. at 560-61, 868 A.2d 302.
At the trial, during opening and closing remarks, defense counsel argued to the jury that the victim was a prostitute, and the sexual encounter was consensual. Defendant did not testify. Id. at 562, 868 A.2d 302. As part of the State's case-in-chief, the prosecutor called the desk sergeant, who testified not only about the statements defendant made to him, but also about the lack of any mention by defendant that he had engaged in consensual sex with the victim. Specifically, the prosecutor focused his questions to highlight defendant's failure to characterize the victim as a prostitute. Id. at 562-63, 868 A.2d 302. The prosecutor emphasized this latter point during his closing argument to the jury.
Writing for the majority of the Court, Justin Albin concluded that the prosecutor's repeated references to defendant's failure to mention any facts that supported his ultimate defense strategy, "`at or near' the time of his arrest," constituted an unconstitutional infringement upon defendant's privilege against self-incrimination. Id. at 573-74, 868 A.2d 302.
We cannot accept the State's depiction of the prosecutor's remarks as merely highlighting the inconsistency between defendant's statement at police headquarters and the defense advanced by his attorney. In assailing defendant's consent defense, the prosecutor's leitmotif was defendant's silence at police *1195 headquarters. The prosecutor was entitled to let the jury know that defendant's claim to the police that he picked [the victim] up for harassment stood in stark contrast to his attorney's trial argument of a consensual sexual encounter. However, the prosecutor went far beyond pointing out that significant inconsistency; instead the prosecutor called for the jury to reject the consent defense because defendant remained silent when he had the opportunity to present it to the police. Here, the prosecutor's thrust was that both before and after [the victim] accused him of rape, defendant did not give to the police the exculpatory account that his counsel provided to the jury. In other words, the prosecutor impaled defendant on his silence, intimating that an innocent man would not have stopped speaking to the police officers, but would have revealed to them the defense offered as truth at trial. We conclude that the prosecutor elicited testimony and commented on defendant's silence at police headquarters to impugn his defense at trial.
[Id. at 566-67, 868 A.2d 302 (emphasis added) (footnote omitted).]
The Court, however, acknowledged that a defendant's statements or inconsistencies, "`at or near' the time of his arrest," are, nevertheless, proper areas of prosecutorial inquiry. Id. at 566 n. 3, 868 A.2d 302.
Here, although some of the prosecutor's questions came dangerously close to crossing the line of demarcation between proper impeachment of defendant's credibility, and unconstitutional comments on his right to remain silent, the thrust of the interrogation stayed within the boundaries of proper cross-examination. The following exchange between the prosecutor and defendant illustrates this point:
Q. In fact, Officer Uram, after he advised you of your rights, you didn't say anything else to him 
A. I did. I was trying to talk to him.
Q.  about what happened in the store? Isn't that correct?
A. I did. I tried to talk to him, but he wouldn't listen to me.
Q. You're saying that Officer Uram, after he was trying to get you to talk about where this gun was, that he just didn't want to hear anything else from you? Is that what your testimony is?
A. Yes.
Q. Isn't it true that on March 24th, 2003, you said that you  a gun was pointed at you by [co-defendant], correct?
A. Yes.
* * * *
Q. Has that ever happened to you before?
A. No.
Q. A gun being pointed at you?
A. No.
Q. Was this the first time on March 24th, 2003?
A. Yes.
Q. But you never decided to tell Officer Uram on March 24th, 2003 about that, correct?
A. I did tell him.
* * * *
Q. Isn't it true that you, at first, did not want to tell Officer Uram anything about a gun?
A. Yes, I thought they were going to bring [co-defendant] with me. I thought they were going to put us together.
Q. But the fact that a gun was pointed at you, you didn't think that that was important to tell the police officer while *1196 you were in his custody, in the back of his car, alone?
[Although the trial court overruled defense counsel's timely objection, the prosecutor did not secure an answer to this question from defendant.]
* * * *
Q. So when the Police Officer Uram had you in his custody, again, you did not tell him anything about the fact that a gun had just been pointed to your head?
A. I did. I tried to tell him, he wouldn't listen to me.
As this excerpt from the State's cross-examination reveals, defendant repeatedly asserted that he attempted to tell the arresting officer what had occurred inside the store, as evidencing his lack of volition to commit any criminal act. Unlike what occurred in Muhammad, what makes this line of inquiry proper, is that defendant affirmatively testified at trial that he had mentioned the details of his duress defense to the arresting officer.
Through its cross-examination, the State was not casting a shadow of culpability based on defendant's post-arrest silence at the scene. Under these circumstances, the prosecutor was properly attacking defendant's credibility by suggesting to the jury that his trial testimony was inconsistent with the events described by the arresting officer.
We hold, however, that at this juncture in the trial, and as part of its overall charge on the law, the trial court should have reminded the jury, using clear and emphatic language, that (1) defendant had the right to remain silent; and (2) no inference of culpability should be drawn from his exercise of that right. Absent such instructions, a jury may improperly conclude that defendant had a duty to come forward with information supporting his duress-defense, at or near the time of his arrest, and that his failure to do so should be considered against him in weighing his overall credibility. This would be precisely the type of unconstitutional inference the Supreme Court found improper in Muhammad.
Because defendant did not request such a charge here, we must review any alleged error in this respect under the plain error standard of review. R. 2:10-2. "Under that standard, we disregard an error unless it is `clearly capable of producing an unjust result.'" State v. Daniels, 182 N.J. 80, 95, 861 A.2d 808 (2004) (quoting R. 2:10-2). Given the substantial evidence presented, we cannot conclude that the absence of such an instruction constitutes plain error.

IV.

Conclusion
Defendant's conviction is affirmed. The matter is remanded for the trial court to conduct a new hearing with respect to the admissibility of defendant's statements to the police.
WECKER, J.A.D., dissenting.
I respectfully dissent because I disagree with my colleagues with respect to both of the significant issues raised by this appeal. First, I conclude that reversal is compelled by State v. Muhammad, 182 N.J. 551, 565-66, 868 A.2d 302 (2005), State v. Lyle, 73 N.J. 403, 406 n. 1, 407 n. 4, 408 n. 5, 410, 375 A.2d 629 (1977), and State v. Deatore, 70 N.J. 100, 107, 115-16, 358 A.2d 163 (1976). Second, apart from the fact that the violation of defendant's right against self-incrimination compels a new trial, I would not find error in the admission of defendant's statement to the police, and therefore no reason to remand for a hearing *1197 on the adequacy of the Miranda warnings he received.[1]

I
In my view, the prosecutor violated defendant's right against self-incrimination when she cross-examined him respecting his alleged failure to give the arresting officer the exculpatory explanation he offered to the jury in support of his duress defense  that co-defendant Samha forced him at gunpoint to participate in the robbery. See Muhammad, supra, 182 N.J. at 565-66, 868 A.2d 302 ("Making reference at trial to what a defendant did not say to the police is commenting on his silence.") (citing Lyle, supra, 73 N.J. at 406 n. 1, 407 n. 4, 408 n. 5, 410, 375 A.2d 629, and Deatore, supra, 70 N.J. at 107, 115-16, 358 A.2d 163). Neither federal law under the due process clause of the Fifth Amendment, nor New Jersey common law, permits a defendant's post-arrest silence to be used to impeach that defendant's testimony at trial. Muhammad, supra, 182 N.J. at 568, 868 A.2d 302 (citing Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98 (1976)[2]); see also Deatore, supra, 70 N.J. at 108-09, 113, 358 A.2d 163.
Here, the arresting officer, Officer Uram, testified in the State's case-in-chief about his initial questions to defendant:
Q Officer Uram, you said that you were at the car, you advised him of his rights again, and based on the information that you received, you had a conversation with Mr. Elkwisni with the public safety in mind.
A I asked him whether, you know, he hid the gun in the store or anything to that nature and first he denied, no, no, no, but he was looking around. He kept looking right to left and appeared very nervous. I just kept talking to him, kept talking to him, and eventually he said  eventually he goes, "it's behind the Huggies." And I said, "where's that?" And he said "the back aisle."
Notably, according to Officer Uram, what defendant initially denied was "whether... he hid the gun in the store or anything to that nature...."[3] The prosecutor then misstated the officer's prior answer:
Q So when he first told you that there was no gun, what was  how long did it take for him to actually say that there was a gun? Like how long was this conversation is what I'm getting at? *1198 A I believe it was only a few minutes. I honestly don't recall how long it was.
The offending cross-examination of defendant began with the prosecutor's question about defendant's "silence" immediately before his arrest:
Q Isn't it true that you did not  when the police arrived, did you run to the  to the front door and say, thank God you're here, I'm a prisoner in this store?
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: It's cross-examination. I'll allow it.
DEFENDANT'S COUNSEL: No, Your Honor, there's no testimony to that. That's just 
THE COURT: I'll allow it. Overruled.
BY PROSECUTOR:
Q Isn't it true you didn't go to the front door?
A I couldn't, [Samha] was standing right in front of me.
The prosecutor's questions continued regarding defendant's post-arrest silence:
Q Isn't it true that when you were arrested and handcuffed, you were placed inside of a police vehicle in the back of the police vehicle, correct?
A Yes.
Q And Officer Uram advised you of your Miranda rights and he asked you about the gun, correct?
A No.
Q And isn't it true that you weren't cooperative on March 24th, 2003?
DEFENDANT'S COUNSEL: Objection, Your Honor.
A Yes, I was.
THE COURT: Once again, overruled. I'll allow it as cross-examination.
PROSECUTOR:
Q Isn't it true that when Officer Uram asked you, there was a gun involved, where is the gun; isn't it true that your response was, no, there was no gun?
A No.
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: Overruled. I will allow it. The jury will make the determination based upon the total testimony of both witnesses.
PROSECUTOR:
Q Isn't it true that Officer Uram then told you about the fact that the Bob's Market, that many children enter the Bob's Market and they could get hurt with this gun?
DEFENDANT'S COUNSEL: Objection, Your Honor. Now she's recounting and actually saying 
THE COURT: Sustain the objection. He happened to be in court the whole time,[4] but I will sustain the objection.
PROSECUTOR:
Q Isn't it true that your first response to Officer Uram was that you didn't know where the gun was, and you had  and there was no gun involved?
A No.
Q It was only after Officer Uram asked you some more questions that you finally said where the gun was.
A I told him where it was.
Q And didn't you tell him that it was behind the Huggies in the last aisle?

*1199 A Yes.
Q Now you stated that throughout the entire time, the gun was being handled by Ibrahim Samha, correct?
A Yes.
Q But, yet, you knew where that gun had been hidden, and you told Officer Uram, correct?
A Yes.
Q And you testified that, in fact, you were separated and placed in two different police vehicles, correct?
A Yes.
Q In fact, Officer Uram, after he advised you of your rights, you didn't say anything else to him 
A I did. I was trying to talk to him.
Q  about what happened in the store? Isn't that correct?
A I did. I tried to talk to him, but he wouldn't listen to me.
Q You're saying that Officer Uram, after he was trying to get you to talk about where this gun was, that he just didn't want to hear anything else from you? Is that what your testimony is?
A Yes.
Q Isn't it true that on March 24th, 2003, you said that you  a gun was pointed at you by Ibrahim Samha, correct?
A Yes.
Q Would you consider that significant?
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: I don't know if I understand.
PROSECUTOR:
Q Something like [that] happening to you?
THE COURT: Sustain the objection.
A I never been involved 
THE COURT: Sustained. You don't have to answer the question. Sustain the objection.
PROSECUTOR:
Q Has that ever happened to you before?
A No.
Q A gun being pointed at you?
A No.
Q Was this the first time on March 24th, 2003?
A Yes.
Q But you never decided to tell Officer Uram on March 24th, 2003 about that, correct?
A I did tell him.
DEFENDANT'S COUNSEL: Objection, Your Honor. He testified that he did 
THE COURT: Sustain the objection.
PROSECUTOR:
Q Well, isn't it true that, at first, you didn't want to tell Officer Uram where that gun was?
DEFENDANT'S COUNSEL: Objection, Your Honor. He testified already, now it's just 
A I wasn't paying attention to what he was saying.
THE COURT: Overruled. I'll allow that question.
PROSECUTOR:
Q Isn't it true that you, at first, did not want to tell Officer Uram anything about a gun?
A Yes, I thought they were going to bring him with me. I thought they were going to put us together.
Q But the fact that a gun was pointed at you, you didn't think that that was important to tell the police officer while you were in his custody, in the back of his car, alone?

*1200 DEFENDANT'S COUNSEL: Objection, Your Honor. She's asking 
THE COURT: Overruled. I'll allow it. As part of cross-examination, you're allowed a little bit more leeway.
DEFENDANT'S COUNSEL: Your Honor, the objection is to opinion. She's asking whether he feels it was important.
THE COURT: No. I'll allow it. Overruled.
DEFENDANT'S COUNSEL: Okay.
After additional questions that established that after defendant's arrest he was physically separated from Samha, the prosecutor returned to the interrupted questioning:
Q Okay. So, according to you, Ibrahim Samha has now pointed the gun at Mr. Darwish and you.
A Yes.
Q So was that traumatic for you, the fact that a gun, for the first time, was being pointed to the back of your head?
A Yes.
DEFENDANT'S COUNSEL: Objection, Your Honor. She's asking for opinion testimony again.
THE COURT: I'll allow it as to it's part of his defense. Overruled.
PROSECUTOR:
Q Was that traumatic for you?
A Of course. I was afraid of him.
Q So when the Police Officer Uram had you in his custody, again, you did not tell him anything about the fact that a gun had just been pointed to your head?
A I did. I tried to tell him, he wouldn't listen to me.
The circumstances in Lyle were remarkably similar to those we address here, and the Court found that it was compelled by Doyle and Deatore to reverse the defendant's conviction for first-degree murder. Lyle, supra, 73 N.J. at 405, 375 A.2d 629. Confronted at the scene, Lyle immediately admitted that he shot the victim, but later claimed the shooting was in self-defense and so testified at trial. The prosecutor elicited direct testimony from the investigating officer that defendant immediately said "I shot him," but said nothing about the victim having been the aggressor. Id. at 406, 375 A.2d 629. The prosecutor cross-examined the defendant about his post-arrest omission, that is, his failure to tell the investigating officer that he shot the victim in self-defense. Id. at 408 and n. 5, 375 A.2d 629. Finally, the prosecutor argued in summation that the earlier omission suggested that defendant was now lying. Id. at 409, 375 A.2d 629. Just like defendant here, Lyle insisted, in answer to the prosecutor's questions, that on the way to the police station, he did tell a detective that the victim had attacked him. 73 N.J. at 408 n. 5, 375 A.2d 629. Defense counsel did not object to the cross-examination or summation; the Court found plain error and reversed. Id. at 409-10, 375 A.2d 629.
Noting that the record was in conflict as to whether Lyle knew or understood his Miranda rights when he was arrested, the Court in Lyle also noted that under Deatore,
as a matter of State law the use of a defendant's silence is improper irrespective of whether such warnings are given. Hence, in the case before us it was manifestly improper to use defendant's silence to attack his self-defense theory as a fabrication. Because this defense was at the very heart of the case, the prosecutor's action was "of such a nature as to have been clearly capable of producing an unjust result ..." and hence in the magnitude of plain error. [Lyle, 73 N.J. at 410, 375 A.2d 629 (citations omitted).]
*1201 Lyle testified that the victim came at him with a screwdriver. Defense counsel argued in summation that the reason no screwdriver was found at the scene was because police failed to look for it after they heard Lyle's self-defense claim. Id. at 417-18, 375 A.2d 629 (Conford, P.J.A.D., dissenting). The State argued that the prosecutor's emphasis on Lyle's alleged failure to tell the police about the screwdriver attack was justifiable rebuttal. Id. at 411, 375 A.2d 629. But the Court concluded that
[w]hile it may have been permissible for the State to argue that the police never found the screwdriver because no one suggested they should search for it, the comments in question constituted an attack on defendant's version of the events by the impermissible use of his silence. [Ibid.]
Describing the Court's decision in Lyle, where the defendant did testify, Justice Albin wrote for six members of the Court in Muhammad: "That the defendant gave only a partial account to the police at or near the time of his arrest did not open the door to prosecutorial questioning about what the defendant did not tell to the police." Muhammad, supra, 182 N.J. at 571, 868 A.2d 302 (citing Lyle, supra, 73 N.J. at 405, 410, 375 A.2d 629). Justice Albin's opinion for the Court in Muhammad rejected the very argument the State makes (and my colleagues accept) here. Muhammad did not testify at trial. The State attempted in summation to characterize his pre-arrest omissions as inconsistent with defense counsel's version of events. Muhammad, supra, 182 N.J. at 565-67, 868 A.2d 302. Thus in Muhammad, the Court was not addressing use of pre-arrest silence to impeach a testifying defendant, but rather use of silence as substantive evidence of guilt. Id. at 573 n. 8, 868 A.2d 302. The Court nonetheless drew a clear line of demarcation between proper use of a defendant's inconsistent statements and improper use of silence and prohibited the State from "impal[ing] defendant on his silence .... to impugn his defense." Id. at 566-67, 868 A.2d 302. The Court relied heavily on its prior reasoning in Lyle, where the issue did arise in the context of cross-examination of a testifying defendant. Thus any attempt to distinguish Muhammad on the ground that the defendant in that case did not testify is unpersuasive. In my view, the facts here clearly fall on the wrong side of "the line of demarcation between legitimate impeachment of a defendant's credibility through the use of prior inconsistent statements, and improper inquiry or comment on defendant's constitutional right to remain silent." See op. of majority at 358, 894 A.2d at 1184.
The majority cites defendant's testimony  that he tried to tell the arresting officer that he was forced into complicity  as justification for cross-examining him on his alleged omission, describing such cross-examination as a legitimate challenge to defendant's credibility. Op. of majority at 373-74, 894 A.2d at 1193-94. In Lyle, however, where the defendant also testified that he tried to tell the police that he shot the victim in self-defense, the Court rejected a similar rationale, finding plain error in the State's use of defendant's factually disputed silence to attack his defense of self-defense. 73 N.J. at 408 and n. 5, 410-11, 375 A.2d 629.
The majority also suggests that because defendant did not remain entirely silent, but did answer Officer Uram's question about the location of the gun, his alleged silence about the claimed duress was inconsistent with his trial testimony. Justice Rivera-Soto drew a similar distinction in his opinion concurring in the result in Muhammad; but the Court did not adopt *1202 that view. See Muhammad, supra, 182 N.J. at 580-84, 868 A.2d 302 (Rivera-Soto, J., concurring). In his concurring opinion, Justice Rivera-Soto distinguished between the defendant's two separate statements, holding that the protection of Deatore, Lyle, and State v. Brown, 118 N.J. 595, 573 A.2d 886 (1990), applied only to the defendant's silence in response to post-detention interrogation, but not to his pre-arrest statement accusing the victim of having harassed defendant's brother and sister. Justice Rivera-Soto would have allowed defendant's earlier comments because they were "defendant's statements, and not silence." Muhammad, supra, 182 N.J. at 583, 868 A.2d 302 (Rivera Soto, J., concurring).
Obviously, if Officer Uram had testified that defendant said something in the police car that was inconsistent with his trial testimony  for example, that Samha threatened him with a knife, whereas at trial he said he was threatened with a gun  the State would have been entitled to use defendant's prior statement both to impeach him in cross-examination and to argue in summation that the inconsistency suggested that defendant was lying. But if the officer testified that defendant omitted some part of his trial explanation when he spoke to the officer at the scene  for example, that he told the officer that Samha threatened him, but did not mention a particular weapon  the State would not have been permitted to use that omission to impeach defendant or to argue that the omission implied that defendant was lying.
The State's right to use a defendant's silence to impeach his testimony in cross-examination was the narrow issue the Court chose to address in Deatore, despite having reversed defendant's conviction, along with that of his co-defendant, for a different reason: "fundamental error" in failing to excuse or at least more thoroughly question a juror who admitted he knew the victim. Deatore, supra, 70 N.J. at 104-05, 358 A.2d 163. There, the defendant put forth an alibi defense. He testified that at the time of the robbery with which both defendants were charged, he was with a woman in a local motel room; the woman he identified also testified in his behalf. The Court addressed the State's argument that it was entirely proper  or at most harmless error  to cross-examine the defendant on his failure to volunteer his alibi when he was arrested. Id. at 106-19, 358 A.2d 163. Chief Justice Hughes, writing for the majority, noted that the issue was one of "general importance," and while subject to "a remarkable variance in judicial views, [it] should be settled so far as New Jersey courts are concerned" even if overwhelming evidence of guilt could be said to make the error "harmless beyond a reasonable doubt." Id. at 106, 358 A.2d 163. Although strong, the evidence of defendant's guilt in this case, in the face of his duress defense, was not so overwhelming that it reasonably could be held to be harmless error.
We followed Deatore in State v. Micheliche, 220 N.J.Super. 532, 533 A.2d 41 (App.Div.), certif. denied, 109 N.J. 40, 532 A.2d 1108 (1987). There the defendant testified at his murder trial, denying his guilt, and claiming that he signed a written confession for police out of fear that the guilty individual who was also in custody, and who had implicated him in the killing, would kill him in jail if he denied his involvement. Id. at 540, 533 A.2d 41. On cross-examination, the prosecutor asked the defendant if he or his attorney, at any time prior to trial, had informed the prosecutor's office of that motivation for his confession. Ibid. The trial judge allowed the questioning, over objection by the defense, on the ground that the defendant was now offering "`an entirely different version.'" Ibid. Judge Antell, writing for *1203 this court, concluded that "[t]o highlight [the defendant's] failure to advise the State in advance of trial as to how he proposed to meet that evidence [of his written confession] infringe[d] upon his right to remain silent in the same manner as State v. Deatore." Id. at 542, 533 A.2d 41. As a result, we were "constrained to reverse" defendant's murder conviction and remand for a new trial. Ibid.
The majority emphasizes the State's right to offer rebuttal testimony, apparently in response to defendant's testimony that he told or tried to tell Officer Uram "what happened inside the store." Significantly, however, when the officer was called on rebuttal, and asked more than once whether defendant made any other statements at the scene, the officer said only "I don't recall" and then "not that I recall." The State's rebuttal thus emphasized defendant's alleged failure to provide his duress defense early on, without a good faith basis for claiming a prior inconsistent statement.
In her summation in this trial, the prosecutor alluded to defendant's alleged "silence":
PROSECUTOR: With regards to this claim of duress, you are now arrested, you're in a police car. The first thing that you're going to do is that you're going to be happy that the police are there.
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: Sustain the objection. Once again, that's an opinion.
PROSECUTOR: Just use your common sense and your life experiences. Are you going to be uncooperative with the police?
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: I'll allow it.
The prosecutor misstated the record when she continued:
PROSECUTOR: Are you going to be uncooperative with the police and tell the police, no, there was no gun involved? Direct questions by Officer Uram to Ahmed Elkwisni, where is the gun, there was a gun involved. And what was his response? No, there was no gun. Does that sound like duress to you?
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: Overruled. The jury will make that determination.
PROSECUTOR: Moments later the police officer continues to engage him in conversation and talks about the fact that this is serious. There could be children that could be hurt by the gun and then he says 
DEFENDANT'S COUNSEL: Objection, Your Honor.
THE COURT: Overruled, he did testify.
[Emphasis added.]
The majority recognizes that "the prosecutor's questions came dangerously close to crossing the line of demarcation...." Op. of majority at 375, 894 A.2d at 1195. I differ only in concluding that the prosecutor crossed that line. As in Muhammad, the prosecutor's "leitmotif" was defendant's silence  his failure to tell officer Uram that Samha coerced his complicity by threatening him with a gun. The State contends that defendant's admission to the officer  that he hid the gun behind the Huggies  was inconsistent with his trial testimony  that the gun was Samha's and Samha used it to threaten him. But the prosecutor went beyond that claimed inconsistency in cross-examining defendant and in arguing in summation that defendant was not "cooperative" with the police *1204 and did not tell him immediately about "a gun being pointed" at him.
The majority also recognizes the trial judge's obligation to give proper limiting instructions and the judge's error in failing to give a limiting instruction on the permissible and impermissible inferences to be drawn from defendant's silence. But the majority finds no plain error. Op. of majority at 371, 377, 894 A.2d at 1192, 1196. I would find that omission to be plain error.[5]
Defendant's duress defense "was at the very heart of the case," see Lyle, supra, 73 N.J. at 410, 375 A.2d 629. I conclude, as did the Court in Muhammad, "that the prosecutor's violation of defendant's state law privilege against self-incrimination was `clearly capable of producing an unjust result.'" 182 N.J. at 574, 868 A.2d 302 (quoting R. 2:10-2). I would therefore reverse defendant's conviction and remand for a new trial.

II
Although I would grant defendant a new trial on the grounds addressed in Part I of this opinion, I find no insufficiency of evidence to support the trial judge's determination that defendant's statement about the location of the gun was admissible, and therefore no reason to order a remand for a new Rule 104(c) hearing.

A
Before his testimony was offered to the jury, Garfield Police Officer Richard Uram testified in a Rule 104(c) hearing during the trial. His direct testimony in that hearing, with respect to advising defendant of his Miranda rights, began as follows:
Q Now at some point in time you were assigned to put under arrest Ahmed Elkwisni. Is that correct?
A That's correct.
Q Tell us how you did it. What did you do?
A As  as they were walking towards the door they were ordered to the ground. I immediately went to him and he laid right on the ground and I placed him in custody. I cuffed him behind his back as he was laying on the ground.
Q And what was the next thing that happened?
A Then I led him out towards my  my police unit, where I searched him, incident to arrest; money out of his  out of his pants that he had on him.
Q What was the next thing that happened. After you searched him incident to the arrest, did he have any weapons on him?
A No, he had no weapons on him.
Q What was the next thing that happened as part of the arrest?
A I was given information that there was possibly a gun involved in this.
Q So as a result of that information, what did you do?
A I informed Officer Marsh that he did not have a gun on him and I believe Officer Sanchez reported his guy didn't have a gun on him either.
Q What was the next thing that happened?

A I began talking to him. Well, first, after I arrested him I  I read him his rights. I remind[ed] him again of his rights inside the car and I asked him  I said, you know, [we] believe there's a gun involved, this is a store, kids go in the store, if you hid it in the store, tell *1205 us where it is. I mean, God forbid a kid goes in there and grabs this gun and he ends up thinking it's a toy, he shoots somebody and he kills him. You know, we have to put the public safety 
Q You said thinking of the public safety, you said?
A Yes.
Q Now were you 
THE COURT: Excuse me one second. Is this what you're saying to him or this is what you're thinking?
THE WITNESS: No, this  well, I'm thinking for the public safety as I'm telling this also. I  I let him know that, you know, little kids go in the store and God forbid they  they get a hold of this gun and, you know, end up shooting or playing around they  they kill somebody or shoot an innocent person.
PROSECUTOR:
Q And you said that you reminded him of his rights in the car. Where was the first place that you advised him of his rights?

A Once he was cuffed.

Q All right. And was that a verbal or a written form?

A Verbal.

Q And then you said you reminded him of his rights again in the car. What car are you referring to?

A My police unit at the time.
Q And was the defendant in the same  the co-defendant, the other person that was arrested, was he in the same car or in a separate car?
A He was in another car and they were facing opposite ways so they couldn't see each other.
Q Okay. So the only two people in the car when you were reminding him of his rights in the car was [sic] you and the defendant Ahmed Elkwisni?

A He was in the car, I was standing alongside the car speaking with him with the door open.

Q Okay. You're standing alongside. Okay.
A Yes. He was in the back.
Q Now when you're having this conversation with him, I take it you're speaking in English?
A Yes.
Q And what about him? What is he speaking [sic] to you and after you advised him of his Miranda rights did he say anything to you?
A He was  he was speaking. When he spoke to me, he speak [sic] English. At first he declined that there  he didn't know anything about a gun. As he's telling me this, he's looking around. He just appeared very nervous. He just kept looking right to left, right to left, looking  looking around and he just  he kept denying it, denying it, denying it. Then eventually he told me  he goes, "It's behind the Huggies."
[Emphasis added.]
The majority concludes that the State failed to offer sufficient evidence that Officer Uram advised defendant of each of the rights required by Miranda. I disagree. "I read him his rights" implies that the officer was reading from a printed card  just as he later testified before the jury.[6] The judge undoubtedly inferred, as he was entitled to, that Officer Uram in fact gave defendant all the required warnings, the same warnings that are printed on cards normally carried by police officers.
On cross-examination during the Rule 104 hearing, defense counsel questioned *1206 Officer Uram about certain descriptions that he included in his written report of the incident: that he searched defendant "incident to arrest," and that he questioned defendant about the gun "with the safety of the public in mind." Defense counsel asked the officer why he included those explanations in his report:
Q Didn't you put that statement there because you hadn't read him his Miranda rights?
A No, I didn't put that there for that reason. No.
Q No? But, in fact, you had not read him his Miranda rights?
A I read it to him.
Q Well, do you have any record of that?
A Verbally? I don't have a verbal  a verbal record with me, no.
Q How many arrests have you made since then?
A Since then?
Q Since then.
A I have no idea. I'd have to check the arrest book. I make a lot of arrests.
Q Greater than ten?
A Yes.
Q Greater than 100?.
A Since then? No, not  not over 100.
Q Well, it has been a year and a half?
A Not over 100.
Q Okay. Over seventy-five?
A Since March of 2003?
Q A lot?
A Yeah. Yes.
Q Your testimony now is that you can remember an arrest a lot of arrests ago, maybe seventy-five arrests ago, we'll say, today even though there's no record of it of what you did that day?
A When I place somebody in custody, I read them their rights.

Q Is that something that you normally do?

A That's how we're trained.

Q So you're testifying from what you normally do. You don't necessarily know that you did it that day?

A I know I did it that day because I do it every time I make an arrest.

Q So you only know you did it that day because you customarily do it?

A Because I always do it.

[Emphasis added.]
Defendant never moved to suppress his statement to Officer Uram on the ground that he was not given the Miranda warnings. Defendant could have testified at the Rule 104(c) hearing; his testimony at the hearing could be used only if he gave conflicting trial testimony and then only for impeachment. See Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259 (1968) (a defendant's testimony at a suppression hearing is not admissible at trial to prove his guilt); State v. Petrovich, 125 N.J.Super. 147, 148, 154, 309 A.2d 281 (Law Div.1973) (defendant was required to respond to cross-examination related to his direct testimony in a suppression hearing, but incriminating testimony would be subject to Fifth Amendment protections and would not be admissible at trial to prove defendant's guilt), cited with approval in State v. Davis, 116 N.J. 341, 373, 561 A.2d 1082 (1989) (superseded on other grounds by N.J.S.A. 2C:11-3i).
The trial judge was entitled to credit the officer's unrefuted testimony that he followed his usual procedure of giving the required warnings to every arrestee. "Although the State bears the burden of establishing beyond a reasonable doubt the voluntariness of the confession, defendant must at least claim that he invoked the *1207 right of silence for the trial court to adjudicate that claim." State v. Bey II, 112 N.J. 123, 140, 548 A.2d 887 (1988) (internal citation omitted) (citing State v. Johnson, 218 N.J.Super. 290, 303-06, 527 A.2d 892 (App.Div.), certif. granted and remanded summarily, 108 N.J. 674, 532 A.2d 248 (1987)). Here, defendant did not testify in the Rule 104(c) voluntariness hearing. He never denied that he was given the Miranda warnings or that he invoked his rights before Officer Uram questioned him. The State's evidence was sufficient to support the judge's finding that defendant was given the required warnings, a finding to which we are obligated under these circumstances to defer. See State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999).
The second element addressed in the Rule 104(c) hearing was the finding that defendant's statement  that the gun was behind the Huggies  was voluntary. Once again, defendant offered no contrary evidence and never claimed that his statement was other than voluntary. Nothing in the officer's testimony raised a reasonable doubt in the trial judge's mind, and there is nothing in the hearing record that raises a reasonable doubt in my mind that defendant's statement was voluntary and therefore admissible at trial.

B
I agree with the majority that the public safety exception originally set forth in New York v. Quarles, 467 U.S. 649, 655-56, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 557 (1984), has not been established on this record. In State v. Stephenson, 350 N.J.Super. 517, 519-22, 796 A.2d 274 (App. Div.2002), where we reject the applicability of the public safety exception, we set forth its required elements. Id. at 525, 796 A.2d 274. Compare State v. Diloreto, 180 N.J. 264, 281-82, 850 A.2d 1226 (2004) (emphasizing that a missing person's safety was at stake in finding that police actions fell within the public safety aspect of the community-caretaking function).
Officer Uram knew that a gun had been involved, and that neither of the detainees had a gun in his possession when taken into custody. The gun had not been found in the store, and certainly the store could not be reopened to the public until it was found. But the victim's store in this case apparently was smaller than the supermarket involved in Quarles. And as the majority notes, police officers still surrounded the store when Officer Uram asked defendant to tell him where the gun was. While even a locked store poses a public safety hazard with a loaded gun hidden inside, there were two alternatives then available to the police, which had not been exhausted. One alternative was to send police into the store to search for the gun. The other alternative was to keep a police guard around the store in the hope that one of the detainees would spontaneously reveal the location of the gun. Since the record does not demonstrate that either of those alternatives was exhausted, I agree that the public safety exception is not applicable.

III
I would reverse defendant's conviction and order a new trial because of the violation of defendant's right not to have his silence used against him at trial. Were it not for that violation, I would not suppress his statement to Officer Uram, and I see no reason to remand for a new Rule 104(c) hearing.
NOTES
[1] Although defendant was convicted of a second-degree offense, the court imposed a sentence within the third-degree range, because, in this case, "the court [was] clearly convinced that the mitigating factors substantially outweigh[ed] the aggravating factors." N.J.S.A. 2C:44-1f(2).
[2] The NERA parole disqualifier only applied to the robbery conviction.
[3] Although not directly discernable from the record, we assume that the State fulfilled its discovery obligation under R. 3:13-3(c)(2). Therefore, defense counsel should have been aware of the need to challenge the admissibility of any statement made by his client to the police, well before the commencement of the trial. R. 3:10-2(a) requires counsel to advise the court, at the post-indictment arraignment/status conference, of his/her intention to file any motion. Thereafter, the timely filing of a motion to suppress a defendant's post-arrest statement triggers a commensurate obligation upon the trial court, absent good cause, to decide the motion before fixing a trial date. R. 3:10-2(b).

Here, the question of the admissibility of defendant's post-arrest statements to the police arose after the commencement of the trial. While we recognize that under State v. Jordan, 147 N.J. 409, 419, 688 A.2d 97 (1997), a trial court is obligated to determine the admissibility of a defendant's post-arrest statements under Miranda, modern criminal case management practices require that this determination be made in advance of trial. R. 3:9-1(d).
Without this pre-trial determination, a defendant is left in the dark about a critical part of the State's proofs against him. A defendant is entitled to know, in advance of trial, the full arsenal of evidence the State has amassed against him, including whether the State can legally present to the jury statements he may have made to the police. Such knowledge is not only indispensable to formulate a sound defense strategy at trial, but it is also essential in assisting a defendant in making the decision to accept or reject a prosecutor's plea-agreement offer. R. 3:9-1(b),(e).
The State is also prejudiced if a determination as to the admissibility of a defendant's statements is not made before trial. Without advance notice of what evidence will be admitted at trial, the prosecutor: (1) is unable to assess rationally the strengths and weaknesses of the State's case; and (2) risks creating grounds for a mistrial, by unknowingly advising the jury, in the course of his/her opening statement, of information the court may subsequently determine to be inadmissible.
While we have no basis to fault the trial judge here, it is the responsibility of trial courts, at the final pretrial conference, to insure that all pretrial motions have been addressed and decided.
[4] We note that defendant's challenge here is limited to the admissibility of his statements, not to the admissibility of the gun itself.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] In Doyle, the Court limited its holding to silence after Miranda warnings, reasoning that failure to give an exculpatory statement "may be nothing more than the arrestee's exercise of these Miranda rights." 426 U.S. at 617, 96 S.Ct. at 2244, 49 L.Ed.2d at 97. But in Deatore, the Court declined so to limit the prohibition against use of a defendant's "failure to volunteer an exculpatory story." 70 N.J. at 117, 358 A.2d 163. And in Lyle, the Court referred to Deatore as having noted that "the use of a defendant's silence is improper irrespective of whether such warnings are given." Lyle, supra, 73 N.J. at 410, 375 A.2d 629 (citing Deatore, supra, 70 N.J. at 117 n. 10, 358 A.2d 163).
[3] In the Rule 104 hearing, the officer had testified:

Q And what about him? [A]fter you advised him of his Miranda rights did he say anything to you?
A He was  he was speaking. When he spoke to me, he speak [sic] English. At first he declined that there  he didn't know anything about a gun. As he's telling me this, he's looking around. He just appeared very nervous. He just kept looking right to left, right to left, looking  looking around and he just  he kept denying it, denying it, denying it. Then eventually he told me  he goes, "it's behind the Huggies."
Officer Uram never testified before the jury that defendant initially said "he didn't know anything about a gun."
[4] Defendant does not argue that he was prejudiced by the judge's inappropriate reference, cf. State v. Daniels, 182 N.J. 80, 97-98, 861 A.2d 808 (2004); State v. Roman, 382 N.J.Super. 44, 58-59, 887 A.2d 715 (App.Div.2005), to the fact that he was "in court the whole time."
[5] Where defense counsel objected to cross-examination on defendant's silence and to related argument in summation, I would find harmful error in overruling those objections and in the failure to give appropriate limiting instructions.
[6] Of course, it is the officer's testimony in the hearing, and not before the jury, upon which we review the decision to admit defendant's statement.