**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1239-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LEONARD J. MAZZARISI 3RD,

    Defendant-Appellant.

_____

> Argued October 22, 2024 – Decided December 24, 2024
>
> Before Judges Gilson, Bishop-Thompson, and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-11-1421.
>
> Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the brief).
>
> Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica de Outeiro, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Leonard Mazzarisi, III, of second-degree aggravated arson, N.J.S.A. 2C:17-1(a); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). The primary evidence used to convict defendant were video footages from surveillance cameras and a statement defendant gave to two detectives at the time of his arrest. At trial, the State introduced two types of evidence that violated defendant's right to a fair trial. First, the State violated defendant's right against self-incrimination by playing an unredacted version of his statement, during which defendant repeatedly invoked his right not to answer certain questions. Second, the State elicited testimony from several law enforcement officers who improperly invaded the province of the jury by narrating the video evidence, including, in two instances, improperly identifying defendant as the person depicted in the footage from one of the videos. We hold that the admission of that evidence violated defendant's right to a fair trial and, therefore, we reverse defendant's convictions and remand for a new trial.

I.

The criminal charges against defendant arose out of three incidences that occurred on August 17, 2017, January 27, 2018, and May 29, 2018. Each

incident involved damage done to the offices of Neuhaus Realty, a company owned by defendant's maternal grandmother and maternal uncle. We summarize the facts from the evidence presented at trial.

Defendant's mother, Lorraine Neuhaus, and his father, Leonard Mazzarisi, II, had owned a building located at 51 Main Street in Holmdel (the 51 Main Street Building). The 51 Main Street Building had been rented to Neuhaus Realty.

In 2011, defendant's parents sold the 51 Main Street Building to Carl Neuhaus, defendant's maternal uncle. At the time of the sale, defendant's mother had divorced defendant's father. Defendant's mother testified that she and her former husband had borrowed $75,000 from her mother when she was first married, and she wanted to pay her mother back $25,000 that was still owed. The father strongly objected to paying the $25,000 back.

Defendant's maternal grandmother, Mimi Neuhaus, testified that the 51 Main Street Building was originally going to be sold for $500,000. The actual purchase price paid was $475,000, which was a reduction of $25,000 to pay back the loan. The State's theory at trial was that defendant had damaged the offices of Neuhaus Realty because he believed he was owed $25,000 from his grandmother.

A-1239-21

A.    The Three Incidences.

1.    The August 17, 2017 Incident.

On August 17, 2017, the 51 Main Street Building was damaged by a small fire at the back of the building.  Someone first noticed the damage the next day, and two days later, on August 19, 2017, police officer Patrick Weimer responded to the building to investigate.  Officer Weimer found that there was an approximate three-foot burn mark on the vinyl siding of the rear of the building.

The police obtained surveillance video footage from a camera owned by Neuhaus Realty.  The video footage showed a car pull into the rear parking lot of the 51 Main Street Building at approximately 8:30 p.m. on August 17, 2017.  A man then got out of the car and shortly thereafter there was an illumination.  A person is then seen walking away from the building back to the car.  The police were not able to identify the person depicted in the video.

On or shortly after August 17, 2017, defendant's mother received several text messages from a number she did not recognize.  The first message stated: "It's time you pay the 25,000 you owe.  You have 72 hours.  I'll send you the account number Monday morning" and attached a bank account and routing number.  A subsequent message stated:  "You have not paid.  You now owe the 50,000 from the sale of the building plus interest.  Total 52,500 due Friday at 5:00 p.m.  Same account."

4

2.    The January 27, 2018 Incident.

On January 27, 2018, the 51 Main Street Building was substantially damaged by a fire. Law enforcement personnel obtained surveillance video from the building. The police could not identify the person depicted in the video, but they were able to identify "what appeared to be a 2017 Hyundai Elantra."

Following a fire investigation, a Deputy Fire Marshal of Monmouth County testified that he could not rule out two potential causes of the fire. He identified those potential causes as an internal fire by "ignitable liquid" or an electrical fire. The Deputy Marshal also testified that he believed some sort of accelerant or liquid had been used to facilitate the fire.

Several days after the January 2018 fire, defendant's mother received more text messages. The text messages came from phone number 804-238-xxxx and stated: "Are you or your mother ready to give me my 25,000 as we agreed to?" Following an investigation, law enforcement personnel were able to identify the owner of the bank account number in the text messages sent to defendant's mother. The account had been opened in the name of a company called "360 Entertainment of New York, LLC" and had an associated mailing address of "16 Burgundy Drive, Holmdel, New Jersey", which was the address of defendant's

father's home. The name on the 360 Entertainment of New York, LLC bank account was defendant's name.

3.      The May 29, 2018 Incident.

After the 51 Main Street Building was substantially damaged by the fire in January 2018, Neuhaus Realty relocated its offices to 4 South Holmdel Road. On May 29, 2018, an employee of Neuhaus Realty was working at that office when she heard "something hit the back of the building" and glass break. The employee testified that she heard something hit the building "five, six times" "[l]ike pops." The employee ran to the back door of the building and saw a red car pull out of the back driveway. When the employee looked out of the back door of the building, she noticed that there were holes in the vinyl siding and the window had been "shot out."

Police Officer Jake Officer Savage responded to the Neuhaus Realty offices at 4 South Holmdel Road that same day. He inspected the building and observed a shattered window and that the siding on the back of the building had been damaged. He also saw BB pellets on the windowsill.

Officer Savage then viewed video footage from Neuhaus Realty's surveillance camera. From the footage, Officer Savage was able to identify a New Jersey license plate on a car depicted in the building's rear. In follow up investigations, the police linked that license plate to a car used by defendant.

A-1239-21

Shortly after the May 2018 incident, police filed charges against defendant related to that incident. Law enforcement also issued a bulletin for defendant's arrest. A day later, on May 30, 2018, defendant was arrested by a sheriff's officer in Virginia. At the time of the arrest, the Virginia sheriff's officer located two BB guns in a hotel room defendant had rented. The sheriff's officer also located a "Hyundai" "red sedan" car that defendant acknowledged was his vehicle. The vehicle had a New Jersey license plate that matched the license plate identified in the video footage from the May 29, 2018 incident.

Two days after his arrest, two New Jersey detectives travelled to Virginia to interview defendant. One of the detectives testified that he provided defendant with his Miranda warnings from a Miranda warning form. Miranda v. Arizona, 384 U.S. 436, 479 (1966). The detective went on to testify that defendant acknowledged that he understood his rights and signed the waiver form agreeing to speak with the officers.

Thereafter, a grand jury indicted defendant for four crimes: two counts of second-degree aggravated arson, one of which related to the August 17, 2017 incident (count one) and the other related to the January 27, 2018 incident (count two). Defendant was also charged with second-degree possession of a weapon for an unlawful purpose (count three), and third-degree unlawful possession of a weapon (count four).

A-1239-21

Before trial, the State moved to admit the statement defendant had given to the two detectives, and defendant opposed the State's motion. The trial court conducted an evidentiary hearing. Thereafter, the trial court granted the State's motion in an order and accompanying written opinion issued on November 21, 2019.

At trial, the State informed the court and defense counsel that it would play the entire unredacted interrogation of defendant. Defense counsel objected, pointing out that in waiving his Miranda rights, defendant had informed the detectives he was only waiving his right to speak with them on the understanding that he could invoke his right to silence by not answering certain questions. Defense counsel also pointed out that the detectives had agreed to that understanding. The trial court, however, denied defendant's motion to have the full interrogation redacted. Consequently, the full, unredacted interrogation of defendant by the detectives was played for the jury at trial.

At the beginning of the interrogation, a detective read defendant his Miranda rights. During the course of that reading, defendant asked if he could not answer certain questions if he did not want to but still proceed to other questions. The detective stated that procedure was "fine." Thereafter, defendant repeatedly invoked his right not to answer certain questions posed by the

detectives.    Defendant also answered other questions and made several incriminating admissions.

The State also played video evidence taken from the surveillance cameras related to each of the three incidences.  Before the surveillance camera footage from the August 17, 2017 incident was played at trial, Officer Weimer described for the jury the video footage.

Several of defendant's family members were also shown the video footage of the August 17, 2017 incident.  While none of them could positively identify the person depicted, several of them testified that the individual depicted in the video could be defendant.  For example, defendant's mother stated that the person's "[b]ody size [and] shape" "reminded [her]" of defendant, although she "couldn't [] positively say that."  Defendant's uncle testified that he could not identify the person in the August 2017 surveillance footage but thought "the person's stature or demeanor" "coupled with the information that [he] knew at the time" "reminded [him]" of defendant.

Detective Sergeant Theodore Sigismondi, one of the lead detectives investigating the incidences, also testified concerning the video footage from the August 2017 incident.  Detective Sigismondi acknowledged that he could not identify the person in the video, but he went on to testify that he was able to "ascertain" that the car in the video "appeared to be a 2017 or [20]18 Hyundai

Elantra, but he was not able to definitively determine that at the time." Detective Sigismondi went on to testify that defendant was "a suspect in his mind" for the August 2017 incident. Concerning the January 2018 incident, Detective Sigismondi testified that he viewed the surveillance footage and, although he was unable to identify the person in the footage, he was able to see the vehicle in the footage was a "red -- what appeared to be a 2017 Hyundai Elantra."

Regarding the video footage from the May 2018 incident, the State presented testimony from two officers. Officer Savage testified that he reviewed the video footage and "observed the red sedan pull in the north driveway from South Holmdel Road, pull around the back of the building. The subject reached into the glove compartment, pulled out a black handgun-style BB gun, and . . . lean[ed] out the driver's side window and [shot] the building multiple times." Officer Savage went on to testify that he knew it was a BB gun rather than a real gun because he saw BBs on the scene before viewing the video. Officer Savage then identified defendant in the courtroom at trial. In doing so, however, Officer Savage acknowledged that he had never seen or met defendant other than looking at the surveillance video. In addition, Officer Savage testified that based on the surveillance footage, the police filed charges against defendant.

Detective Sigismondi also testified about the surveillance video from the May 2018 incident. In his testimony, he identified defendant as the person in

the video. Detective Sigismondi also testified that he understood that defendant was in the car in the May 2018 surveillance video, and he then identified defendant in the courtroom at trial. On cross-examination, Detective Sigismondi confirmed that defendant had been a suspect in his mind since the first incident. He also testified that he matched defendant to the May 2018 surveillance video by looking at a photograph of defendant. Detective Sigismondi had apparently obtained defendant's photograph sometime prior to viewing the May 2018 surveillance video.

Various members of defendant's family also watched the video footage from the May 2018 incident. His mother testified that the person depicted in the footage looked like her son, but she acknowledged that she had not seen defendant in years. Defendant's grandmother testified that she recognized defendant as the person in the 2018 surveillance footage. However, she acknowledged that she had not seen defendant in over twelve years. Defendant's maternal uncle and aunt also testified that they recognized defendant as the person depicted in the May 2018 surveillance footage.

After hearing all the testimony, the jury acquitted defendant on count one, the aggravated arson charge relating to the August 2017 incident. The jury found defendant guilty of the remaining charges, including the aggravated arson

11

charge related to the January 2018 incident, and the two weapons charges related to the May 2018 incident.

Thereafter, defendant moved for a judgment of acquittal or a new trial. The trial court denied those motions. Defendant was then sentenced to an aggregate prison term of ten years, with forty-two months of parole ineligibility. Specifically, the trial court sentenced defendant to five years of incarceration on the conviction for aggravated arson. The court also sentenced defendant to a consecutive term of five years of incarceration, with forty-two months of parole ineligibility, on the conviction for second-degree possession of a weapon for an unlawful purpose. The conviction for third-degree unlawful possession of a weapon was merged with the conviction for possession of a weapon for an unlawful purpose.

## II.

Defendant now appeals from his convictions. He advances six arguments on this appeal, which he articulates as follows:

> POINT I – MAZZARISI'S STATEMENT MUST BE SUPPRESSED BECAUSE DETECTIVES DID NOT CLARIFY WHETHER HE WAS INVOKING HIS RIGHT TO COUNSEL WHEN HE ASKED A SERIES OF QUESTIONS ABOUT WHAT COUNSEL WAS AVAILABLE TO HIM, WHICH THEY FAILED TO ANSWER. THE STATE CANNOT SHOW THAT THE SUBSEQUENT WAIVER WAS KNOWING AND VOLUNTARY.

12

POINT II - THE ADMISSION OF VIDEO SHOWING MAZZARISI REPEATEDLY ASKING ABOUT THE SCOPE OF HIS MIRANDA RIGHTS AND INVOKING HIS RIGHT TO SILENCE DURING HIS INTERROGATION VIOLATED HIS RIGHT TO A FAIR TRIAL.

POINT III - THE STATE'S ELICITATION OF EXTENSIVE INADMISSIBLE LAY OPINION BY SIX WITNESSES -- INCLUDING AN OFFICER WHO HAD NEVER SEEN MAZZARISI PRIOR TO TRIAL AND FOUR RELATIVES WHO HAD NOT SEEN HIM IN A DECADE -- PURPORTING TO IDENTIFY MAZZARISI IN THE CRITICAL SURVEILLANCE FOOTAGE INVADED THE JURY'S PROVINCE AND COMPELS REVERSAL.

POINT IV - THE STATE ELICITED INADMISSIBLE HEARSAY TESTIMONY FROM DETECTIVE WEISBROT THAT CHRISTOPHER MAZZARISI'S NAME "NEVER CAME UP" AND THAT "ALL THE INFORMATION AND EVIDENCE . . . RECEIVED INDICATED HE WAS NOT INVOLVED AND THAT [DEFENDANT] WAS," IN VIOLATION OF MAZZARISI'S RIGHTS UNDER THE CONFRONTATION CLAUSE.

POINT V - THE COURT'S RESPONSE TO THE JURY'S REPORT THAT IT HAD BEEN AT AN IMPASSE FOR "A GOOD LENGTH OF TIME" AND THAT "IT SEEMS LIKE WE WILL NOT MAKE ANY PROGRESS ON REACHING A UNANIMOUS DECISION" WAS COERCIVE.

POINT VI - THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED MAZZARISI A FAIR TRIAL.

13

Having reviewed defendant's arguments in light of the governing law, we hold that two of the arguments require a reversal of his convictions and a remand for a new trial. The first ground warranting a reversal is based on the admission of the unredacted interrogation of defendant. We hold that defendant did voluntarily waive his Miranda rights and agree to speak with the detectives who interrogated him following his arrest. In waiving his rights, however, defendant asked if he could invoke his right to silence regarding certain questions, and the detectives agreed to that request. Accordingly, at trial it was a reversible error to admit his unredacted interrogation.

The second ground warranting reversal was the narration of the video evidence. Two law enforcement officers were allowed to identify defendant as the person depicted in the video footage from the May 2018 incident. Because those officers based the identification on their review of the video, they lacked the foundation for making the identification. Moreover, by making the identification, they improperly invaded the province of the jury.

A.     Defendant's Statement.

The Fifth Amendment of the United States Constitution guarantees all persons the privilege against self-incrimination. U.S. Const. amend. V. That privilege applies to the states through the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; Griffin v. California, 380 U.S. 609, 615 (1965). In addition,

in New Jersey, there is a common-law right against self-incrimination, which has been codified in a statute and a rule of evidence. State v. Reed, 133 N.J. 237, 250 (1993); N.J.S.A. 2A:84A-19; N.J.R.E. 503. Accordingly, it has long been established that when a person "is taken into custody or otherwise deprived of his [or her] freedom[,]" that person is entitled to certain warnings before he or she can be questioned. Miranda, 384 U.S. at 479; see also State v. Tiwana, 256 N.J. 33, 41 (2023); State v. Hubbard, 222 N.J. 249, 265 (2015).

1.      Whether Defendant Waived His Miranda Rights.

When reviewing a decision on a motion to suppress, appellate courts defer to a trial court's factual findings and will uphold those findings when they are supported by sufficient, credible evidence in the record. Tiwana, 256 N.J. at 40 (quoting State v. A.M., 237 N.J. 384, 395 (2019)). In contrast, appellate courts do not defer to a trial court's legal conclusions, which are reviewed de novo. Ibid. (citing State v. Rockford, 213 N.J. 424, 440 (2013)). In that regard, a trial court's legal conclusions "'and the consequences that flow from established facts'" are reviewed de novo on appeal. State v. Bullock, 253 N.J. 512, 532 (2023) (quoting Hubbard, 222 N.J. at 263).

"In determining the voluntariness of a defendant's confession, we traditionally look to the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion." State v.

Nyhammer, 197 N.J. 383, 402 (2009). Among "'the important factors'" to consider in determining the validity of a Miranda waiver are whether the suspect understood both that he did not have to speak and the consequences of choosing to speak. Ibid. (quoting State v. Magee, 52 N.J. 352, 374 (1968)).

The New Jersey Supreme Court has made it clear that "'a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel.'" State v. Alston, 204 N.J. 614, 622 (2011) (quoting Reed, 133 N.J. at 253). "[I]f the words amount to even an ambiguous request for counsel, the questioning must cease, although clarification is permitted; if the statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed." Id. at 624. "Because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant." State v. Chew, 150 N.J. 30, 63 (1997) (citations omitted); see also State v. Gonzalez, 249 N.J. 612, 629 (2022).

Pretrial, the State moved to admit defendant's statement to the police at trial. Defendant opposed that motion and cross-moved to suppress the statement. At the evidentiary hearing, the two detectives who conducted defendant's interrogation testified. The trial court also reviewed a video recording of defendant's interrogation.

At the beginning of the interrogation, one of the detectives read defendant his <u>Miranda</u> warnings. After reading the warning about defendant's right to have counsel present, defendant stated:

> I do understand what it is that you have just read to me. My question to you is, an attorney in the State of Virginia where you're asking me these questions, or are you talking about an attorney from New Jersey needing to come here right now for these questions? Because an attorney from Virginia isn't necessarily able to practice law in the State of New Jersey.

The detective and defendant then discussed what type of attorney could be made available to defendant and whether the attorney would be a court-appointed attorney. The detective then asked: "Okay. So, going back to that right . . . you have the right to consult with an attorney at any time and have him present before and during questioning; do you understand that?" Defendant responded: "Yeah. Totally." After defendant had been read all his <u>Miranda</u> rights, he stated that he understood all those rights. He then signed a <u>Miranda</u> waiver form.

Defendant now argues that because the detective did not clarify whether defendant was invoking his right to counsel, his waiver was not voluntarily and knowingly given. The record does not support that argument.

Read in full context, defendant was not invoking his right to counsel even ambiguously. He repeatedly stated he understood his rights and he simply asked questions about what type of counsel might be made available to him.

17

Accordingly, the evidence at the suppression hearing supported the trial court's finding that defendant clearly understood and voluntarily waived his Miranda rights.

2. Whether It Was An Error To Admit Defendant's Full, Unredacted Interrogation At Trial.

While we hold that defendant voluntarily and knowingly waived his Miranda rights, he did so with the clear understanding that he could invoke his right to silence concerning particular questions. We, therefore, hold that it was a reversible error to admit defendant's full interrogation, which included repeated invocations of his right to silence.

The New Jersey Supreme Court "has reaffirmed time and time again that '[t]he privilege against self-incrimination . . . is one of the most important protections of the criminal law[.]'" State v. Clark, 251 N.J. 266, 292 (2022) (first alteration in original) (quoting State v. Presha, 163 N.J. 304, 312 (2000)). Accordingly, the Court has also held that trial courts should endeavor to excise any reference to a criminal defendant's invocation of his Miranda rights. Clark, 251 N.J. at 292; State v. Feaster, 156 N.J. 1, 75-76 (1998).

During trial, defendant moved to redact portions of his interrogation where he invoked his right to silence and refused to answer specific questions. Defendant also pointed out that, at a minimum, the court needed to give a limiting instruction. The State agreed a jury instruction would be necessary, and

it represented that it would not comment on defendant's invocation of his right to silence.

The trial court ruled that the entire unredacted interrogation could be played in front of the jury.  In making that ruling, the trial court reasoned that defendant's refusal to answer certain questions was not an attempt to end the questioning, but rather it was part of an ongoing stream of speech.  The trial court, therefore, reasoned that redacting part of the interrogation would leave gaps in the discussion and could confuse the jury.

Before the State played the entire unredacted interrogation, the trial court did instruct the jury.  In doing so, the trial court reminded the jury that the State had the burden to prove defendant committed the charged crimes beyond a reasonable doubt and defendant had "an absolute right to remain silent."  The court then instructed the jurors:

> To the extent the defendant invokes his right not to answer certain questions, again, it is his right to do so. You are not to infer guilt from the invocation of that right, nor are you permitted to consider that invocation as evidence of guilt.  You may consider defendant's invocation of his right to remain silent only for purposes of assessing credibility and voluntariness of the statement, and for no other purpose.  Again, you may not consider his silence as evidence of guilt.

Appellate courts "defer to a trial courts' evidentiary ruling absent an abuse of discretion."  State v. Garcia, 245 N.J. 412, 430 (2021).  Accordingly, we "will

19

not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

"There can be no doubt that the right of an accused or a suspect to remain silent when in police custody or under interrogation has always been a fundamental aspect of the privilege [against self-incrimination] in the state." State v. Deatore, 70 N.J. 100, 114 (1976). "The practical effect of the privilege to remain silent is . . . 'that when a defendant expressly refuse[s] to answer, no inference can be drawn against him . . . and no comment thereon may be made to the jury.'" Id. at 115 (first quoting State v. Ripa, 45 N.J. 199, 204 (1965); and then citing State v. Lanzo, 44 N.J. 560, 563 (1965)); see also State v. Muhammad, 182 N.J. 551, 567 (2005) (explaining that a jury should not be able to infer guilt from a suspect's silence because courts "cannot know whether a suspect is acquiescing to the truth of an accusation or merely asserting his privilege").

Having reviewed the unredacted statement that was played before the jury, we hold that the trial court erred in denying defendant's request to redact the portions of the statement where he invoked his right to silence. The State presented and played for the jury defendant's entire interrogation including the

review of his <u>Miranda</u> rights and the more than ten times that defendant invoked his right not to answer certain questions.

Initially, it is important to recognize that defendant's waiver was conditioned on his understanding that he could invoke his right to silence regarding certain questions. In that regard, he specifically asked the detectives if he could elect not to answer particular questions. In doing so, he also clarified that he "wouldn't be looking to say, from this point forward, I don't wish to be speaking to you. I would just not wish to be answering that particular question." The detective responded that defendant's request was "fine." In other words, defendant reasonably believed that if he chose not to answer a question, that choice could not be used against him.

During the interrogation, defendant repeatedly invoked his right to remain silent as to certain questions. For example, defendant did not answer when he was asked when he was last in New Jersey, when he had last spoken to his mother, whether the Neuhaus Realty office was located in Holmdel, if he had ever asked his mother for $25,000, whether he recognized the red car in the Neuhaus Realty video footage, or any questions regarding the May 2018 incident.

21

Each of those choices not to answer was an invocation of his right to silence. Accordingly, playing those questions for the jury violated defendant's right against self-incrimination.

Moreover, the invocations were not fleeting and ambiguous. Indeed, by playing them in context with the questions defendant did answer, defendant's invocation of his right to silence became even more incriminating.

Furthermore, the trial court's instruction to the jury did not cure this error. While the trial court correctly told the jury that they could not use his invocation as evidence of his guilt, the court incorrectly told the jury that they could consider his invocation to remain silent for purposes of assessing the credibility and voluntariness of the statement. The law is clear that an invocation of the right to silence cannot be used for any purpose. See Muhammad, 182 N.J. at 558 ("a suspect who initially responds to police questioning may later assert his right to remain silent without fear that his silence will be used to incriminate him at trial. A suspect . . . does not waive his right against self-incrimination when he falls silent[.]"); State v. Elkwisni, 384 N.J. Super. 351, 377 (App. Div. 2006) ("no inference of culpability should be drawn from . . . [defendant's] exercise of . . . [the] right [to remain silent].").

In denying defendant's application to redact the statement, the trial court relied on two cases where a defendant waived his Miranda rights, but qualified

his waiver by saying he would not answer certain questions.  See State v. Kucinski, 227 N.J. 603 (2017); Feaster, 156 N.J. at 1.  Kucinski is distinguishable because the invocation of the defendant's Miranda rights in that case was never directly read to the jury.  See Kucinski, 227 N.J. at 623-24 (examining situation where defendant had waived his right to remain silent, and was "cross-examin[ed] regarding facts to which he testified at trial, but omitted in his statement to police").  Feaster is distinguishable because it involved a police officer who proffered testimony that only incidentally referenced defendant's invocation of his right to counsel.  See Feaster, 156 N.J. at 75-77 (holding that six lines of testimony was admissible because they only made "fleeting . . . reference to defendant's invocation of his right to counsel").

Here, by contrast, the trial court admitted testimony where defendant invoked his Miranda rights thirteen different times.  That error was compounded because defendant, in several instances, repeatedly asserted that he was unwilling to answer questions concerning the May 2018 incident.  Moreover, the State represented that the purpose of the interrogation video was for the jury to "determine whether or not they believe in the credibility of it."  In that regard, the trial court did just what the Supreme Court has held courts cannot do:  admit testimony "'elicited to draw unfavorable inference[s] to the fact that defendant decided to remain [silent][.]'"  Id. at 75 (quoting State v. Ruscingno, 217 N.J.

Super. 467, 471 (App. Div. 1987)). Although courts in their discretion may permit testimony where a defendant invokes his or her Miranda rights, id. at 76, such discretion is only properly exercised if the testimony does not "[lead] [to] prejudice [] or unfair inference against either party[,]" and "its omission would be likely to mislead or confuse the jury." Id. at 75-76.

In short, it was reversible error to allow the State to play the full, unredacted interrogation of defendant and that error deprived defendant of his right to a fair trial.

B.    The Narrations of The Video Evidence.

The New Jersey Supreme Court has set forth certain rules governing what is and is not permissible when a witness narrates video evidence when that witness did not observe the events in real time. See State v. Watson, 254 N.J. 558, 600-01 (2023). The Court has explained "that Rules 701, 602, and 403 in tandem provide the proper framework to assess video narration evidence by a witness who did not observe events in real time." Id. at 600. The Court then set forth four principles to guide the admission of narrative testimony concerning video evidence. In that regard, the Court explained:

> First, neither the rules of evidence nor the case law contemplates continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording. To avoid running commentary, counsel must ask focused questions designed to elicit

24

specific, helpful responses. 'What do you see?' as an introductory question misses the mark.

Second, investigators can describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations.

. . .

Third, investigators may not offer their views on factual issues that are reasonably disputed. Those issues are for the jury to decide. So a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not.

. . .

Fourth, although lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.

[Id. at 603-04 (citations omitted).]

In giving specific examples, the Court also explained that an investigator cannot say "'that's the defendant'" while describing video evidence to a jury. Id. at 604.

Applying these principles to defendant's trial, the State presented testimony from three officers that violated Rules 701, 602, and 403. The two clearest violations were the testimonies of Detective Sigismondi and Officer Savage.

In his testimony before the jury, Detective Sigismondi was shown the video footage from each of the three incidents. He testified that he could not make a positive identification of the person depicted in the video footages from the August 2017 and January 2018 incidences. He did, however, tell the jury that he was able to identify the car depicted and that that car was a 2017 Hyundai Elantra. He also told the jury that defendant was a suspect in both incidences. The detective was then shown the surveillance video from the May 2018 incident. He told the jury that based on his review of the video footage, he identified defendant. In that regard, the detective was asked the following questions and gave the following answers:

> Q     All right, now at this time I'm going to play S-77C (Video plays from 3:15:30 to 3:16:00 CourtSmart time)
>
> Q     All right. I'm just going to pause it. Now, having reviewed this -- this video with your investigation, were you able to make a determination as to an identification here?
>
> A     Yes.
>
> Q     And who is -- what -- did -- so, if you did make an identification as to who was the identification made of?
>
> A     Leonard Mazzarisi, III.
>
> Q     Is that the same suspect you had in mind for the August 17, 2017 incident?

A-1239-21

A      It was.

Q      Is it the same subject you had -- same person you had in mind for the January 27, 2018 arson?

A      It was.

The detective went on to repeat that identification. In that regard, he answered the following questions:

Q      All right. And now based on the videos that you had -- based on the video for the May 29, 2018 incident involving what you indicated as a BB gun, who do you -- who is it that you understood is in that vehicle in that video?

A.      Leonard Mazzarisi, III.

Q.      And do you see him in court today?

A.      Yes.

Q.      All right. And can you please point him out and a piece of clothing he's wearing?

A.      I'm sorry?

Q.      Can you please point him out and a piece of clothing he is wearing?

A.      He's seated right there wearing a blue button-up shirt with a tie.

The prosecutor and the trial judge then confirmed for the jury that the detective was identifying defendant. Defense counsel then asked: "Judge, just for the record, a positive identification of the person he saw in the video,

27

correct?" And the trial judge responded: "The person [you] saw on the video, correct?" Both the prosecutor and the detective confirmed that the detective's identification was based on the video. In that regard, the prosecutor asked the detective: "And who is that person that you saw in the video?" And the detective responded: "Leonard Mazzarisi, III."

In summary, Detective Sigismondi told the jury more than three times that defendant was the person depicted in the surveillance footage from the May 2018 incident. Those identifications violated the rules established by the Supreme Court in <u>Watson</u>. Moreover, the detective's improper identifications were compounded because he was allowed to also testify that defendant was a suspect based on his review of the video footage from the other two incidences. The detective then improperly identified defendant in court based only on his review of the video footage from the May 2018 incident. Given the critical nature of that testimony, admission of that testimony was reversible error.

That reversible error was compounded because Officer Savage also identified defendant based on his review of the video footage from the May 2018 incident. Officer Savage was shown the video. He was then shown several photographs taken from the scene. He was then asked: "Thank you. All right. Now based on this surveillance footage, did you actually file any charges against anybody?" In response, the officer stated: "Yes, . . . Leonard Mazzarisi, III."

28

The officer was then asked to identify defendant in court which he did based on his review of the surveillance footage. On cross-examination, Officer Savage confirmed that his identifications of defendant were based only on the pictures he had seen of defendant. In short, like Detective Sigismondi, Officer Savage identified defendant as the person depicted in the May 2018 video footage based purely on his review of that footage.

Additionally, the improper identifications made by the officers compounded a problem with the evidence in this case. Defendant's various relatives, including his mother, grandmother, and maternal aunt and uncle, were also shown the video footage from May 2018. They all conceded that they had not seen defendant for years, but they all nonetheless identified him as the person depicted. Those identifications were improperly bolstered by the identifications made by the police officers.

In addition to the improper identifications of defendant, the State also introduced improper narrative testimony concerning the surveillance video footage from the August 2017 incident. Officer Weimer narrated what the surveillance footage showed before it was played to the jury. In that regard, he was asked the following question and provided the following answer:

> Q. And can you describe for everybody as to what it actually showed?

29

A. When I observed the surveillance footage, it shows nighttime surveillance footage in black and white color. On August 17th, approximately 8:28 p.m. on the video, you see what appears to be a gray or silver sedan pull into the rear lot of 51 Main Street, Neuhaus Realty. You see a subject park his vehicle. He exits the vehicle, walks what appears to be towards the rear of the building, but it is dark out. Approximately a minute later, 829 hours -- excuse me -- 8:29 p.m., the scene is illuminated on the screen by what appears to be a fireball and you can see the subject now moving from the rear of the building back to the vehicle in the parking lot. As the subject runs away from the source of the fire, you get an idea of what he -- you know, an idea of what he looks like. Approximately 6 foot tall male, white, bald, wearing jeans and a loose fitting white T-shirt.

That type of running commentary is the type of testimony the New Jersey Supreme Court has ruled is inadmissible. See Watson, 254 N.J. at 603 ("investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence"). See also State v. Allen, 254 N.J. 530, 547 (2023) (disproving of video footage testimony drawn from "inferences or deductions" and "subjective interpretations" of what appears on the video). As already summarized, the Court has directed that running commentary of video evidence is not permissible and "counsel must ask focused questions designed to elicit specific, helpful responses." Watson, 254 N.J. at 603.

### III.

In summary, the admission of defendant's repeated invocations of his right to silence deprived defendant of a fair trial. Additionally, the identifications of defendant made by Detective Sigismondi and Officer Savage were improper and should not have been admitted. Those improper identifications were compounded by other narrative testimony concerning the video footage provided by Officer Weimer. The cumulative effective of all the inadmissible testimony deprived defendant of a fair trial. Each of those reasons constitutes reversible error. In combination, they require vacation of defendant's convictions and sentence and a remand for a new trial. Given those holdings, we need not consider defendant's other arguments.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1239-21